ETHEL ROSS, ADMINISTRATRIX, APPELLANT, V. EDWARD H.
CARROLL ET AL., APPELLEES.
291 N. W. 726

FILED APRIL 26, 1940.   No. 30733.

*Kenneth S. Wherry*, for appellant.

*Chambers, Holland & Locke* and *T. J. Kiesselbach, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

SIMMONS, C. J.

This is an action to recover damages for the death of plaintiff's husband resulting from the collision of two trucks on a public highway. The defendants are copartners, owners of a truck involved in the collision, and their employee, the driver of the truck. The sufficiency of the pleadings is not questioned. Plaintiff alleged that the defendants were guilty of negligence in that (1) their truck was driven into an intersection and around a blind corner at an excessive rate of speed; (2) that no signal was given while their truck was approaching or was in the intersection; (3) that the defendants' truck was being driven on the left or wrong side of the highway at the time of the collision.

At the close of plaintiff's case, defendants separately moved for an instructed verdict on the ground that there was no evidence to show negligence of the defendants to have been the proximate cause of the accident. This motion was sustained and a verdict directed for the defendants. Plaintiff appeals.

This situation requires an examination of the evidence.

There is no serious dispute about the following facts. The collision occurred about 9:30 a. m., June 20, 1938, upon a state highway in Gage county, Nebraska, at a point where the highway turns from a north and south course to an east and west course. A dirt highway continues to the north. The state highway is slightly curved as it makes the turn; as it approaches the curve, from the south going north, there is a slight elevation in the grade; the roadway is banked at the turn to the southeast; and as it goes east, the highway slopes slightly into a down-grade. The highway is graveled on the traveled surface, and on the day of the accident was dry and in good condition. In the con-

struction of the road, a cut was made in the hill which left a bank to the southeast of the curve. Wheat, ready for harvest, was growing upon this elevated land. This created a situation where cars immediately approaching the turn from either side were hidden from view of cars approaching from the other direction except for the restricted view directly in front. Plaintiff's husband and her brother were driving west in a Ford "pick up" truck (hereinafter called the Ford). The Ford was owned by the brother, who was driving. The plaintiff's husband was a passenger. Their speed is not shown. They had traveled over about two-thirds or three-fourths of the curve when the collision occurred so that the Ford at the moment of impact was headed more south than west. The defendant Neff, in the course of his employment, was driving a large freight truck (hereinafter called the truck), 20 feet long, 12 feet high, and 8 feet wide, north along the highway, and had started to make the turn when the collision occurred. The truck's direction was more north than east. Neff, one Carel, and a 10-year-old boy were occupants of the truck. There is a "turn" sign some 500 feet to the south. At that point, the truck began to slow down, and was traveling about 30 miles an hour as it started into the turn. The truck gave no warning of its approach as it went around the turn. No showing is made as to whether or not a warning was given by the Ford. The truck driver first saw the Ford when it was 30 to 40 feet away from him (it could not have been seen before that time), put on his brakes with force, and had almost stopped when the collision occurred. The Ford did not slacken its speed nor vary to the left. The two vehicles came together with the left front wheel of each vehicle receiving the direct force of the impact. The truck was knocked back three feet and turned on its right side, with the right rear top corner of the body resting against the bank on the east side of the road. The Ford was almost demolished. The left front wheel was broken and torn from the axle, the axle, dropped to the ground, dragged about one and one-half feet making a mark in the highway. The

crank case was broken, and the oil dripped out upon the ground, making a spot a foot or more across, and ran down to the southeast along the slope of the highway. The right front wheel of the Ford was not seriously damaged. Glass from both vehicles was upon the highway, and there was blood near the oil spot. One occupant of the Ford was thrown clear of the car and was picked up several feet away from it. The other occupant was beneath the wreckage of the Ford. Parts of the car were moved to free him, but the chassis was not moved at that time. The said occupants were rendered unconscious immediately and died the same day without regaining consciousness.

The apparent conflict in the testimony is as to the exact location of the two vehicles at the moment of impact and goes to the question as to whether they were on their right side of the highway. There were no eyewitnesses except the occupants of the two vehicles. Plaintiff called as her witness, Carel, a passenger in the truck and apparently a friend of the defendant Neff. He testified as to some of the facts already recited and, further, that the truck was proceeding on its right half of the highway, that in making the turn it was not more than four feet away from the bank on the south and east, that the Ford was "hugging the inside of the curve," was on the defendants' right side of the road, that the cars came together "head on," and that both vehicles came to rest on the defendants' (right) side of the highway. The damage to the left front wheels indicates that the Ford was largely to the west of the truck at the moment of the impact. At one point in his testimony, the witness Carel says the Ford after the collision was to the "north and west" of the truck and within three feet of it. Plaintiff's other witnesses, who reached the scene of the accident shortly thereafter, place the north and front end of the truck out into the highway, headed north and west and across the center line of the traveled portion of the highway. These same witnesses put the fragments of glass and the oil and blood spots all west of the center line of the highway.

This apparent conflict in the evidence largely disappears

upon an examination of a photograph of the vehicles taken following the accident. Over objections of the plaintiff, it was put in evidence by the defendants on cross-examination of the witness Carel. The photographer who took the picture did not testify as to the usual foundation facts. The witness Carel testified that it was a clear and accurate reproduction of the way the truck and the Ford looked immediately after the accident and before either were moved. We need not now determine the question of the sufficiency of the foundation. The testimony of the witness Carel is that the truck was "knocked back about three feet" by the impact and tipped over. There is no evidence as to the movement of the Ford following the impact except that as to the left front axle. The picture was taken from several car lengths to the south and from a point to the west of the south-bound lane of travel. Had the picture been taken from the east side of the highway, looking directly north, it might have shown the truck headed northwest as plaintiff's witnesses, including Carel, testify. The picture shows the body of the truck lying on its side with its top to the east and its underside facing west, with the right wheels on the ground and the left wheels in the air. It shows the right lane of travel and the *right front wheel* of the truck touching the worn tracks made by the *left wheels* of vehicles that have traveled east. It also shows the *right* rear wheel of the truck touching the worn tracks made by *right* wheels of vehicles that have traveled east. The truck is eight feet wide. If the truck were put back on its wheels in the position in which it was before tipping over, it would follow that the rear wheels of the truck would be in their lane of travel, the left front wheel of the truck would be some six or seven feet to the west of its lane of travel, the truck body would be diagonal thereto, and the front end conceivably in the lane of travel of the Ford going south. The witness Carel, in explaining what happened, said: "As we was coming around the curve we was traveling I imagine thirty miles an hour and *so we was kind of going over,* Neff took his foot off the foot feed and kind of glided down the hill

and we was coming around the curve, I imagine we was going thirty miles an hour, we seen this truck about thirty or forty feet ahead, then when Neff seen the truck he slammed on his brakes and they come on head-on right into us; we was on the right-hand side of the road and they was hugging the inside of the curve." What did the witness mean by "we was kind of going over?" The statement could relate to speed. However, considering the speed, the size of the truck, and the turn, might it not also mean "we was kind of going over" the turn? Unexplained, it is for the jury, not for the court, to say what was meant. This latter interpretation of the statement of the witness Carel and of the photograph is strengthened by the fact that only the right rear top corner of the truck was resting against the bank. Obviously, the front end of the truck was not as close to the bank as the rear end, and, accordingly, must have been nearer the center of the road and diagonal to its lane of travel. If the latter meaning is the correct one, then we must also recognize the fact that the truck at the time of the impact was at least three feet further north and three feet further into the Ford's lane of travel than the picture shows. So interpreted, the picture largely removes the conflicts in Carel's testimony between his statement above quoted and his other testimony and that of other witnesses on that same question.

Under the circumstances here presented, the plaintiff is not bound by the unfavorable statements of the witness Carel to the extent that those statements control over all other evidence offered, including Carel's own statements.

"A party is ordinarily bound by the testimony of his own witness on the question of negligence, unless the circumstances or the evidence of other witnesses would warrant the jury in disregarding the evidence of such witness." *Zimman v. Miller Hotel Co.*, 95 Neb. 809, 146 N. W. 1030.

"Also, if all the favorable evidence, both direct and circumstantial, produced by plaintiff fairly tends to prove the material facts necessary to make a *prima facie* case, the fact that there were inconsistencies or contradictions in some of

the testimony of himself or his witnesses will not justify the court in sustaining a demurrer to the evidence." 64 C. J. 388, and cases there cited. See, also, *Merchants Bank v. Dunn*, 41 N. M. 432, 70 Pac. (2d) 760; *Davis v. Wallace*, 169 Okla. 497, 37 Pac. (2d) 602.

Is the evidence sufficient to make a *prima facie* case against the defendants?

"In reviewing a direction to the jury at the close of plaintiff's evidence to return a verdict in favor of defendant, the appellate court will assume the existence of all material facts which competent evidence on behalf of plaintiff establishes or tends to prove and give him the benefit of proper inferences from such facts." *In re Estate of Skade*, 135 Neb. 712, 283 N. W. 851.

Under the above rule, this evidence is sufficient to support a finding that the defendants' truck was driven upon the wrong side of the road into a blind corner, where visibility was limited to 40 feet ahead, at a speed of thirty miles an hour, without the sounding of a horn, and that the Ford in which plaintiff's husband was riding as a passenger was upon its own side of the road.

"A motorist driving at such speed that he cannot stop or turn aside in time to avoid an obstruction discernible within the range of his vision is usually negligent." *Hardung v. Sheldon*, 133 Neb. 427, 275 N. W. 586. See, also, 5 Am. Jur. 652, sec. 269.

"No person shall operate a motor vehicle on any highway outside of a city or village at a rate of speed greater than is reasonable and proper, having regard for the traffic and use of the road and the condition of the road, nor at a rate of speed such as to endanger the life or limb of any person, * * *." Comp. St. Supp. 1939, sec. 39-1193.

"(a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing. (b) The following speeds shall be *prima facie* lawful, but in any case when such speed would be unsafe, it shall not be lawful: (1) Twenty miles per hour in any business district; (2) Twenty-five miles per hour

in any residence district; (3) Sixty miles per hour between the hours of sunrise and sunset * * * upon any highway outside of a city or village. (c) The fact that the speed of a vehicle is lower than the foregoing *prima facie* limits shall *not relieve the driver from the duty to decrease speed when approaching and going around curves,* when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions, *and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle or other conveyance* on or entering the highway in compliance with legal requirements and the duty of all persons to use due care." Comp. St. Supp. 1939, sec. 39-11,101.

"(b) No vehicle shall, in overtaking and passing another vehicle, or at any other time, be driven to the left side of the roadway under the following conditions: (1) When approaching the crest of a grade or *upon a curve* in the highway where the driver's view along the highway is obstructed." Comp. St. Supp. 1939, sec. 39-11,103.

"What is a reasonable speed is necessarily largely dependent on the situation and the surrounding circumstances, it being obvious that a speed which would be safe, reasonable, and proper in some places and under some circumstances might be highly dangerous, unreasonable, and improper in other places and under other circumstances." 42 C. J. 926.

"Generally speaking, the speed at which a car may be driven around a curve in the exercise of ordinary care is less than may be required in other places. Some statutes limit the speed in going around a corner or a curve where the operator's view is obstructed and provide that a speed in excess of that fixed shall be *prima facie* evidence of negligence. Other statutes require the driver to have his vehicle under control, without specifying the effect of violation of the statute. Negligence in this regard, however, is usually held to be a question for the jury." 5 Am. Jur. 686, sec. 342.

"When a motor vehicle is approaching or rounding a corner or curve there is a special necessity for keeping to the right-hand side of the road and the driver has not the right to drive on the left-hand side relying upon having time to turn to the right if a car approaching from the opposite direction comes into view." 42 C. J. 906. See, also, 42 C. J. 931; 5 Am. Jur. 686, sec. 341.

"Every motor vehicle when operated upon a highway shall be equipped with a horn in good working order capable of emitting sound audible under normal conditions from a distance of not less than two hundred feet." Comp. St. Supp. 1939, sec. 39-1170.

"The driver of a motor vehicle traversing defiles, canyons or mountain highways shall hold such motor vehicle under control and as near the right-hand side of the highway as reasonably possible *and upon approaching any curve where the view is obstructed within a distance of two hundred feet along the highway shall give audible warning with a horn or other warning device.*" Comp. St. Supp. 1939, sec. 39-1157.

These statutes require not only the installation of warning devices on motor-propelled vehicles, but that they shall be used to apprise travelers of the approach of an oncoming car. *Christoffersen v. Weir,* 110 Neb. 390, 193 N. W. 922.

"The duty to sound a signal of the approach of a motor vehicle depends largely on the circumstances of the particular case. A special necessity exists where the car is on the wrong side of the highway, * * * *or is approaching a curve * * *.*" 42 C. J. 917.

Defendants contend that this case is controlled by the holding of this court in *Hessler v. Bellamy,* 128 Neb. 571, 259 N. W. 514, where the rule is stated:

"Where undisputed physical facts demonstrate that collision out of which injuries arose was not caused by negligence of defendant, the evidence is not sufficient to support a verdict for plaintiff.

"If the evidence essential to a recovery by plaintiff is clearly disproved by the physical facts and conditions, the trial court shall direct a verdict against him."

However, that rule applies only where the undisputed facts demonstrate that the collision was not caused by the negligence of the defendant. *Dederman v. Summers,* 135 Neb. 453, 282 N. W. 261; *Hill v. Interstate Transit Lines,* 137 Neb. 110, 288 N. W. 508.

With reference to the testimony as to the glass, oil and blood spots being on the west side of the road, defendants argue that this feature of the case is controlled by the reasoning in *Anderson v. Interstate Transit Lines,* 129 Neb. 612, 262 N. W. 445. The evidence there showed the position of the vehicles after the collision. However, in that case, "nothing in the evidence tends to reasonably identify the point of collision, with reference to the center boundary of the highway. The actual problem presented by the record in its present form is one of the resolution of forces, and we would be required to determine from the position of the two motor vehicles at the conclusion of the incident, just where they actually collided. With no evidence before us as to the weight, speed, location on the highway, or direction of movement thereon, of either truck or bus at the moment of impact, obviously this cannot be done."

The distinction in the facts presented is obvious, for here there is positive evidence as to the movement of the truck following the impact, and evidence that "tends to reasonably identify the point of collision, with reference to the center boundary of the highway."

The rule in the *Anderson* case might be applicable to the position of the Ford following the impact, for we find no evidence showing the movement of the Ford body following the impact, save the testimony as to the left front axle mark in the road.

It follows that the evidence offered was sufficient to require a submission of the case to the jury, and that the trial court erred in sustaining defendants' motion for a directed verdict.

REVERSED AND REMANDED.

MESSMORE, J., not participating.

JOHNSEN, J., dissenting.

I have hitherto followed the practice of not filing a written dissent, where I merely disagreed with the writer of an opinion upon his statement or interpretation of the facts. It has been my view that, if I was unable to convince my associates, in the consultation room, of the correctness of a factual analysis of a case, it was advisable, generally speaking, to bow to their judgment, or, at most, simply to enter on the record a notation of my dissent. Written expressions of judicial disagreement on facts ordinarily can serve no useful purpose, except to gratify a defeated litigant and his counsel. Such expressions obviously are of no value in the development of jurisprudence, and any manifestation of discord or lack of unanimity in reading and interpreting the facts of a record may only weaken public confidence in the soundness of judicial decision. On principles of law, however, and their applicability to a particular case, I have never hesitated to make a full expression of my individual views.

It is with some reluctance and regret that I make an exception and departure from the foregoing principles in this case. I must do so, however, or make a compromise with my conscience, which to me is impossible. The majority opinion seems to me to so utterly ignore the inexorable facts of the situation that I cannot let it pass unchallenged. If it were possible to have some of the photographs, which are in the record, printed in the published reports, I would not have to waste time in further discussion. Exhibits 1 and 4 fully tell the story of the collision. To me, they demonstrate conclusively that the vehicles met head-on as they were rounding the curve, and that after the collision both of them were still entirely on defendant's side of the highway. Defendant's truck never was and never could have been on the left side of the highway. After the accident it continued to face northeast, the direction in which it had been traveling, except that it had tipped over against the bank. Some of the plaintiff's witnesses confusedly referred

to the truck's direction as northwest, but the photographs leave no possible ground for any misunderstanding here.

The majority opinion says: "Plaintiff's other witnesses, who reached the scene of the accident shortly thereafter, place the north and front end of the truck out into the highway, headed north and west across the center line of the traveled portion of the highway. These same witnesses put the fragments of glass, and the oil and blood spots all west of the center line of the highway." "The picture was taken from several car lengths to the south and from a point to the west of the south-bound lane of travel. Had the picture been taken from the east side of the highway, looking directly north, *it might have shown* the truck headed northwest as plaintiff's witnesses, including Carel, testify." "If the truck were put back on its wheels in the position in which it was before tipping over, it would follow that the rear wheels of the truck would be in their lane of travel, the left front wheel of the truck would be some six or seven feet to the west of its lane of travel, the truck body would be diagonal thereto, and the front end *conceivably* in the lane of travel of the Ford going south." "The damage to the left front wheels indicates that the Ford was largely to the west of the truck at the moment of the impact." "* * * this evidence is sufficient to support a finding that the defendants' truck was driven upon the wrong side of the road into a blind corner * * * and that the Ford in which plaintiff's husband was riding as a passenger was upon its own side of the road."

The photographs, as I have indicated, not only fail to substantiate these statements, but they utterly disprove them. I do not think it is proper to conjecture on what some imaginary photograph, not in the record, "might have shown." Certain it is that the photographs in evidence do not warrant the assumption that, if the truck were put back on its wheels, its front end would be in the lane of travel of the Ford,—either "conceivably," or any other way. It was not the left front wheels of the vehicles that collided, for the motor and the whole front end of the Ford are

shown demolished. The testimony of the eyewitness called by plaintiff was that it was a head-on collision. The statements of relatives and friends of the deceased that the front end of the truck protruded beyond the center of the highway after the collison cannot be accepted against the incontrovertible evidence of the photographs. The same is true of the statement that there was an oil patch on the Ford's side of the highway. The oil had dripped from the Ford after the impact, and only by moving the Ford where the photographs show it was not can the oil patch be placed beyond the center of the highway. The evidence indicates that glass was scattered all over the highway and the fact that some of it flew beyond the center of the road certainly is of no evidentiary significance. The conclusion that "the defendants' truck was driven upon the wrong side of the road * * * and that the Ford * * * was upon its own side of the road" can only be reached by using a judicial derrick to move the cars from the place where the photographs conclusively establish them to have been.

The opinion, to my mind, is based wholly on unwarranted speculation and artificial reconstruction of the obvious physical facts.

CARTER, J., concurs in the dissent.