JAMES FRANKS, APPELLANT, V. JOHN R. JIRDON ET AL., APPELLEES.

14 N. W. 2d 372

FILED MAY 5, 1944. No. 31597.

*F. J. Reed,* for appellant.

*Mothersead & Wright, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, CHAPPELL and WENKE, JJ., and POLK and NUSS, District Judges.

PAINE, J.

Plaintiff brought an action at law for $2,305.70 balance due from defendant on purchase of potatoes. At the close of the evidence the trial court instructed the jury to return a verdict for the defendants, from which plaintiff appeals.

In the amended petition plaintiff brought suit against John R. Jirdon, Theodore Currier and three others, doing business as an unincorporated association, for the balance due on an oral contract to buy certain potatoes. It is alleged that on March 1, 1942, plaintiff by this verbal agreement sold Theodore Currier, who was acting for the said association, which was doing business under the trade name of "John R. Jirdon Potato Division," all of the potatoes contained in 14 bins of potatoes in his potato cave south of

Lingle, in Goshen county, Wyoming, for the agreed price of $1.45 per cwt. for all salable potatoes; that under the terms of the agreement all of the .potatoes were to be run over a 1½-inch potato screen, and that all rots, cuts and greenheads were to be discarded; that this processing, removal and hauling of the potatoes were all to be done by the defendants at their expense; that within two weeks of said date defendants took the potatoes from where they were stored. Plaintiff claims that there were in excess of 5,965 cwt. of marketable potatoes; that plaintiff was given no opportunity to count the number of bags removed, or to weigh or measure them before defendants mingled them with potatoes purchased from other sellers, whereby the potatoes of plaintiff lost their identity, and plaintiff denies that the defendants weighed all the potatoes.

Plaintiff charges that in processing these potatoes they should have been run over a 1½-inch potato screen, but instead they were run over a 1 7/8-inch screen several times, which made it appear that the salable potatoes were much less than the bins actually contained. Plaintiff admits that defendants paid the sum of $6,343.55 during the time the potatoes were being processed, and that there is a balance due and owing of $2,305.70, which defendants refuse to pay.

The defendants for answer admit that they are an unincorporated association, engaged in the wholesale handling of potatoes, admit that they made the contract to buy potatoes in the cave of plaintiff in Wyoming, admit that they received the potatoes; deny that there were 5,965 cwt. of marketable potatoes in the 14 bins of potatoes which they purchased after discarding all small potatoes which passed through a 1½-inch potato screen and all rots, cuts and greenheads; deny that plaintiff had no opportunity to check the quantity of potatoes removed, and allege that they properly processed the said potatoes, and that it was agreed that the term "hundredweight" of potatoes should mean a sack of potatoes weighing 101 pounds including the sack, and allege that they paid $6,343.55, which was the full purchase

price for all of said potatoes purchased by them under their contract. The reply was a general denial.

The principal assignment of error charged that the court erred in withdrawing the case from the jury and sustaining defendants' motion for a directed verdict. As this assignment involves the questions of fact, we will briefly review the evidence.

The plaintiff testified that he had long been engaged in raising potatoes, and had averaged 50,000 bushels a year; that one of his farms was in the state of Wyoming, and that the potatoes from that farm were stored in a potato cellar about 80 feet long, with a driveway through the middle of it, and the bins are 15 feet wide. The walls were all the same size, so that one bin board would fit any bin in the cellar. In the fall of 1941 the bins were filled with potatoes and absolutely level, by being hand dressed on the top after they were filled to make them all level. The potatoes were extremely sound and good; there had been no frost that season, and they were of a uniform, medium size. The planks of the trucks, as they transported them to the bin, were padded with sacks to avoid bruising the potatoes, and the potatoes had settled in the bin about nine inches.

He testified there was a four-acre tract in one of the fields that was inclined to be "seepy" where the potatoes were watered too heavily, and these potatoes carried some dirt. He said the agreement when he sold them was that they should go over an inch and a half screen, cuts, rots and greenheads out, and that defendant Currier said, "I will give you $1.50 over an inch and seven-eighths screen, and I will give $1.45 over an inch and a half screen," and the plaintiff accepted the offer of $1.45 per cwt. over a 1½-inch screen, with cuts, rots and greenheads out; that when plaintiff went out to the potato cellar a day or so later he objected to their sorting them over a 1 7/8-inch screen, and defendant Currier said that he would make the necessary adjustments. Plaintiff testified that as they were running them out the potatoes were sound and had very few sprouts and would roll of their own accord.

The plaintiff testified that the ten bins on the north side were 79.66 feet long and 14.66 feet wide, and the potatoes in the bin were 9.4 feet high. On the south side there were three bins 24.16 feet long and 14.66 feet wide and nine feet high, making a total of 14,162.46 cubic feet of potatoes sold to the defendants, and this includes 90 sacks that were in the 14th bin, and 1.34 cubic feet of these particular potatoes would produce a bushel, or 60 pounds, of potatoes, making due allowance for their passing over a 1½-inch screen, with cuts, rots and greenheads out.

According to the plaintiff's estimate, there were 5,965 cwt. of potatoes sold, at $1.45 a cwt. This would give a total value of $8,649.25, upon which the defendants paid $6,343.55, leaving a balance of $2,305.70, for which suit was brought.

After the plaintiff had determined that there was a shortage, he was asked: "Q. What, if anything, was said by Mr. Currier to you after you done your figuring? A. He said that we were short. He was short and way short and wondered where they were. They were gone, but where were they? Q. I will ask you if Mr. Currier said anything to you about using the volume and what you got out of the six bins that you kept as a check against this? A. He did."

Jake Steben testified he was the plaintiff's foreman, and was living on the farm of plaintiff, and with the help of the hired man had grown about 51 acres of the potatoes which went into this cave on this place, and that they were pretty nice potatoes. He testified he went down the first afternoon after the crew was there; they were using a power sorter, as there was electric current at the cave, and that he was there at the cave once or twice a day all the time the potatoes were being processed by the defendants' crew. He did not see but very few sprouts on the potatoes, and only the potatoes in the three west bins carried any dirt, and in the rest of the bins there was no dirt on them.

Mr. Steben testified that he heard the conversation out there between plaintiff and Currier. "Q. Tell the jury what was said? A. Well, Jim told him that there was too many

potatoes thrown out that wasn't necessary and Ted admitted it, that there were." They counted all the sacks that had been filled, and there were 1,282 sacks run over the 1 7/8-inch screen and the drops which had come from the first three bins.

Mr. Steben also testified that he sorted the potatoes in the six bins on the south side after the defendants had taken away the potatoes they bought, and the potatoes stood about four inches lower on the south side than in the north side bins taken by the defendants; that he sorted them over a 1½-inch screen, and kept count of the bags and took out the rots and cuts, but testified that he only took out some of the greenheads, for it does not hurt to plant greenheads, and the large greenheads were kept separate and used later for planting; that out of all the six bins on the south side there were only about 150 bushels of rots and cuts, and he got 2,846 bags of potatoes out of these six bins.

Witness Steben also explained in detail the unusual care with which he had gathered the crop and stored them in this potato cellar; that they used precaution to keep them from bruising, using sacks with straw as pads, and canvas over the top, and drove the trucks very slowly; that during the months after they were put in the cave he went there twice a day to see that the temperature was right for ventilation.

The plaintiff called Reid Gamble, a member of a partnership which bought and shipped potatoes, living at Torrington, Wyoming, who was a potato inspector for the government and the state from 1932 to 1937. He had been a field man for defendant company for over three years, buying potatoes for them. Mr. Gamble testified he saw these potatoes while they were being dug and being put in the cellar. Later, about the middle of February, he inspected them with a view of buying them. He measured the bins to determine the amount, and took samples by going on top and digging down, and said the potatoes were in very good condition, they were level on top, uniform, medium-sized potatoes. He did not observe any sprouts which would be det-

rimental to the potatoes. From the knowledge he had of these potatoes when they were being harvested, and his inspection of them in February, he gave it as his opinion that only 10 per cent of the total volume of these bins would be discarded over a 1½-inch screen, with cuts, rots and greenheads out. However, the objection to this answer was sustained as not responsive to the question put to the witness, but further examination brought that there were very few cuts or rots, and on cross-examination he said he saw some sprouts.

Witness Gamble produced the card upon which he had made the measurements in the middle of February, and testified to the jury that ten bins were 80 feet long, 15 feet deep, and 9 feet 6 inches high to the top of the potatoes; that the bins on the south side were 9 feet 6 inches high and 24 feet long, and the same depth; that there were some potatoes in the 14th bin which he also inspected and estimated at 250 bushels, this being about two weeks prior to the time the defendants started processing them on March 1.

He testified that defendant Currier admitted there was a shortage, this evidence being as follows: "Q. Mr. Gamble, did you have occasion to talk to Mr. Currier sometime after these potatoes had been removed from the cellar? A. I have. Q. I will ask you if anything was said by Mr. Currier as to these potatoes? A. Yes, sir. * * * Q. Just state what was said. * * * A. We were just talking about them and he said there was a shortage, couldn't find it and asked me what I would do. I told him." When Mr. Currier was on the stand he admitted the conversation, but said he only stated that Mr. Franks claimed there was a shortage.

We will now examine the evidence of the defendants. The defendants put what is known as a "country crew" in this potato cellar, consisting of six men and the foreman and one extra trucker, who was paid on a contract. The potatoes were first run over a 1 7/8-inch screen, and all cuts, rots and greenheads were taken out, then the potatoes which went through the 1 7/8-inch screen were run over a 1½-inch screen, and all sacked in 101-pound sacks. All

potatoes except 310 sacks which were hauled to a car at Lingle, Wyoming, were weighed twice, with the exception of one truckload which reached Morrill too late, on account of a blowout, to be weighed over the scales. After the potatoes reached the warehouse they were run through the washer and washed, graded and repacked.

Some of defendants' witnesses testified that the potatoes would run 15 to 20 per cent greenheads, that the potatoes carried considerably more dirt than the average potatoes, and that these potatoes were sprouted so badly that they would not roll down by themselves, but had to be dug loose in the bin; that the sprouted potatoes were in the center of the bin.

Herbert N. Renfro, Jr., federal supervising inspector for several states, testified that he had held that position for 15 years, and has occasion to compute the amount of potatoes in bins frequently, principally for purchase by the government or in passing on loans, and that the formula that is gotten up by the Bureau of Standards takes the cubic feet contents of a bin and divides it by 2.4, which gives the hundredweight of potatoes in the bin.

Howard McLean, the Scottsbluff manager of the Nebraska Certified Potato Growers, testified that he had been handling from 900 to 1,200 cars of potatoes a year through his office, and that the formula they used for determining the amount of potatoes was by dividing the cubic feet in a bin by 1.43 cubic feet, which would give the 60-lb. bushels of potatoes in the bin.

The deposition of Z. Schwanz, the warehouse foreman for defendant company at Morrill, disclosed exactly the care given to the plaintiff's potatoes from the time they began arriving at the warehouse on February 27 and were weighed, washed, again sacked, this time putting 102 pounds in each sack, according to the rules of the Western Weighing and Inspection Bureau. Exhibits A, B and C were the original warehouse records of the quantity of these "Bliss Triumph" variety of potatoes sold to them by plaintiff.

Mr. Schwanz testified that exhibit A shows the receipt of

332,320 pounds, exhibit B shows 15,010 pounds, exhibit C shows 55,280 pounds, or a total of 402,610 pounds of potatoes; that they were put up in 3,908½ sacks, and adding the 310 sacks trucked to Lingle makes a total of 4,218½ sacks.

The evidence of the defendants admits the purchase of the potatoes, and that the "country crew" at once went out to the cave and began processing the potatoes according to contract, and preparing them for sale as commercial stock; that with the exception of those hauled to a car at Lingle, and one truckload late because of a blowout, they were all weighed twice, once in the cellar by the cellar foreman and again over the scales at the warehouse, checked twice on sack counts, and paid for in full, according to the defendants' figures.

At the close of the evidence the trial court instructed a verdict for the defendants.

This was not an action to recover damages for potatoes the defendants refused to accept. The defendants accepted all of the potatoes in the bins they contracted to buy. They claim to have paid for all the sacks of potatoes they took away. The plaintiff, on the other hand, gives us the exact cubic contents of the bins, and claims they took out over $2,300 worth of potatoes for which they did not pay him.

Section 69-463, Comp. St. 1929, provides: "Where, under a contract to sell or sale, the property in the goods has passed to the buyer, and the buyer wrongfully neglects or refuses to pay for the goods according to the terms of the contract or the sale, the seller may maintain an action against him for the price of the goods."

The plaintiff has brought the proper action under this law for the balance of the purchase price he claims to be due him.

From this brief synopsis of the evidence, sufficient to give the main contentions of each party, but without going into the cumulative evidence of many more witnesses as found in the two volumes of the bill of exceptions, we are faced with the question: Should such a case be taken from the jury and dismissed by the court?

In the case at bar, the controversy is narrowed to a single question: What was the true and actual amount of potatoes, of certain specifications, contained in some 14 bins of potatoes sold by the plaintiff and accepted by defendants? If defendants have paid for all such potatoes therein, then the defendants should prevail, but if they took out more potatoes than they have paid for, then the question would be up to the jury to determine the amount of the shortage under the evidence.

The law is that, as the jury are the sole judges of the credibility of the witnesses and the effect to be given their testimony, it is error for the trial court, at the close of the evidence, to withdraw a case from the jury and dismiss it if disputed questions of fact are involved and different minds could draw different conclusions from the evidence. See *Interstate Airlines, Inc. v. Arnold,* 124 Neb. 546, 247 N. W. 358.

"When evidence offered by one party at the trial tends to discredit that offered by the other, it is for the jury to weigh and decide, under proper instructions from the court." *Aetna Life Ins. Co. v. Ward,* 140 U. S. 76, 11 S. Ct. 720. In the same case, at page 88, the court said: "The jury were the judges of the credibility of the witnesses * * * and in weighing their testimony had the right to determine how much dependence was to be placed upon it. There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony. That part of every case, such as the one at bar, belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and so long as we have jury trials they should not be disturbed in their possession of it, except in a case of manifest and extreme abuse of their function."

In *Zielinski v. Dolan,* 127 Neb. 153, 254 N. W. 695, we said: " * * * the appellate court, in reviewing such decision,

will assume the existence of every material fact which the evidence on behalf of the plaintiff tends to establish and, in addition, give the plaintiff the benefit of the logical inferences therefrom." See *In re Estate of Skade*, 135 Neb. 712, 283 N. W. 851; *Ross v. Carroll*, 138 Neb. 1, 291 N. W. 726; *In re Estate of Hoagland*, 126 Neb. 377, 253 N. W. 416.

"An ordinary witness may state his estimate of the common qualities of familiar articles observed by him, as they existed at any time sufficiently near to be relevant. He may also state that a similarity in quality exists, or state his inference as to whether the quality observed conforms to a given standard, as merchantability, that prescribed by contract, or that established by a sample." 32 C. J. S. 154, sec. 498.

"Quantity, like number, is a matter which from its nature must frequently be the subject of opinion evidence. Persons who have qualifications which show them to be capable of forming opinions which may reasonably be expected to be correct and trustworthy may give opinion testimony upon the question as to the quantity of goods delivered. Conversely, if it appears that witnesses do not have sufficient knowledge or opportunity of observation, their opinions are inadmissible." 20 Am. Jur. 680, sec. 808.

Plaintiff contends that the total weight of the potatoes as reported by defendants was not in accord with known physical facts, and adduced evidence of the kind and condition of these potatoes, and the quantity which certain bins held when filled with such potatoes. This made a *prima facie* case. In the absence of countervailing evidence, plaintiff would have been entitled to recover the difference in value between the amount so proved and the amount paid.

Can such a *prima facie* case be taken from the jury because testimony on the part of defendants is that a less amount was taken from such bins of potatoes and that the bins did not hold the amount claimed? We think not. For the plaintiff had a right, under such circumstances, to have his case submitted to the jury, so that they might say by their verdict whether or not the plaintiff's case was sufficient as against the evidence of defendants.

Such evidence of the plaintiff was not conclusive, yet it was a fact which, if established by witnesses according to plaintiff's contentions, was entitled to consideration by the jury in deciding what amount, if any, was due to plaintiff. See *Cunningham v. Scott*, 109 Neb. 586, 191 N. W. 673; *Bissett v. Bryant Lumber Co.*, 156 N. Car. 162, 72 S. E. 205; *Calnon v. Fidelity Phenix Fire Ins. Co.*, 114 Neb. 53, 205 N. W. 942.

We find a hay case which is very similar under the facts to the case at bar. Plaintiff sold defendant all the hay in a barn, to be weighed as drawn, and paid for at its actual weight. Defendant's evidence was that he drew out all the hay in four loads which totaled 9,830 pounds. Plaintiff was permitted to introduce evidence tending to show the extent of cubic space in the barn from which the hay was taken, and how much space a ton of hay would occupy. Defendant contended it was error to receive this evidence. The court said: "But it was clearly admissible as substantive evidence * * * . It was competent to show that the amount of hay accounted for could not have filled a given space * * * ." Judgment for plaintiff was affirmed. *Alger v. Morrill*, 68 Vt. 598, 35 Atl. 483.

Where the quantity of potatoes sold, which were removed and weighed by the buyer, is in issue, testimony of men experienced and skilled in handling potatoes, as to the total space occupied by the potatoes, and as to the cubic space required for a bushel, or hundredweight, of potatoes, is admissible as tending to show the actual amount of potatoes occupying such space, for on the question of quantity any competent evidence is admissible if relevant and material. See 55 C. J. 402; *Bissett v. Bryant Lumber Co., supra.*

"Physical facts may not be accepted as a matter of law or as ground for refusal to submit a case to a jury as against the testimony of witnesses on a controverted question of fact, unless they are demonstrable to a degree that reasonable minds cannot disagree as to their existence, and unless the results flowing therefrom are demonstrable to the same degree agreeable to the known and immutable laws of phys-

ics, mechanics or mathematics." *Jones v. Union P. R. Co.,* 141 Neb. 112, 2 N. W. 2d 624. See, also, *Dodds v. Omaha & C. B. Street Ry. Co.,* 104 Neb. 692, 178 N. W. 258; 3 Am. Jur. 451, sec. 891; Annotation, 21 A. L. R. 141.

In an action to recover the price of potatoes sold, a witness may give his estimate of quantity, provided he is qualified by observation and possesses sufficient data, knowledge, or experience on which to ground his opinion. See 32 C. J. S. 154, sec. 498.

Where the contract of sale provides that the potatoes were to be processed for the purpose of eliminating greenheads, cuts, sprouts, dirt and drops from a 1½-inch screen, and only the potatoes remaining were to be the subject of the sale, a witness who examined the potatoes in the bins, and who has knowledge and experience in processing and handling this and similar grades and types of potatoes, may properly estimate the loss in quantity that will be sustained in processing the potatoes to meet the conditions of the contract.

In the case at bar, we find that the plaintiff's evidence was sufficient to require a submission of the case to the jury. Because a retrial of the case will follow, it is not necessary to discuss the other assignments of error.

The trial court erred in sustaining defendant's motion for a directed verdict, and the judgment entered is reversed and the cause is remanded.

REVERSED.